IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ANGELA CAUDLE,                                )
      Plaintiff,                            )
                                 )
             v.                               )        CIVIL NO. 3:13-CV-091
                                 )
CAROLYN W. COLVIN,                            )
Acting Commissioner of Social Security,       )
      Defendant.                            )
_____)

## REPORT AND RECOMMENDATION

Angela Caudle ("Plaintiff") is 48 years old, has a high school education and previously worked as a housekeeper, teacher's aide and cashier. On October 26, 2009, Plaintiff applied for Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an alleged onset date of August 9, 2003. Thereafter, Plaintiff amended her alleged onset date to April 21, 2010, alleging disability due to disorders of the back, affective disorder, glaucoma, hyperlipidemia, hypertension, dermatitis and obesity. Plaintiff's claim was presented to an Administrative Law Judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on December 20, 2012.

Plaintiff now challenges the ALJ's denial of benefits, arguing that the ALJ improperly assigned less than controlling weight to the opinions of her treating physicians and applied the wrong legal standard when determining Plaintiff's credibility. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 11) at 6, 11.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). This matter is now before the Court for a report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) on Plaintiff's Motion for Summary Judgment (ECF No. 10) and

Defendant's Motion for Summary Judgment (ECF No. 12).[1]  For the reasons set forth below, the

Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED;

Defendant's Motion for Summary Judgment (ECF No.12) be GRANTED, and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges whether the ALJ erred in assigning the opinions of the

treating physicians less than controlling weight and whether the ALJ properly determined

Plaintiff's credibility, Plaintiff's educational and work history, medical history, non-treating state

agency physician opinion, reported activities of daily living, hearing testimony and third party

functioning report are summarized below.

A.  Plaintiff's Education and Work History

Plaintiff completed high school.  (R. at 175.)  She previously worked as a cashier,

teacher's aide, voter registrar and most recently as a housekeeper.  (R. at 170.)  Plaintiff stopped

working in September 2009 after she was let go, and she has not worked since.  (R. at 169.)

B.  Plaintiff's Medical Records

1.  Plaintiff's Physical Disorders

On June 24, 2008, Glinda R. Sykes, FNP, indicated that Plaintiff alleged a back injury

around 2000, and that she complained of back pain.  (R. at 316.)  Ms. Sykes also noted that

Plaintiff was overweight.  (R. at 316.)

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D.
Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration
of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information
to only the extent necessary to properly analyze the case.

On March 5, 2009, Plaintiff failed to follow-up for a scheduled appointment. (R. at 307.) During an appointment on April 30, 2009, Ms. Sykes reported that Plaintiff failed to go to the Medical College of Virginia for pain in her lower back, and that Plaintiff continued to complain of lower back pain with muscle spasms. (R. at 306.) Ms. Sykes noted tenderness in Plaintiff's lumbar region and an anterior subluxation on Plaintiff's L4-L5. (R. at 306.) Ms. Sykes opined that Plaintiff may have a dermatitis allergy. (R. at 306.)

On May 13, 2009, Plaintiff failed to follow-up for a scheduled appointment. (R. at 304.) On July 15, 2009, Plaintiff returned for a follow-up appointment, complaining of back pain. (R. at 302.) Ms. Sykes reported an anterior subluxation of Plaintiff's L4-L5 and that Plaintiff had lumbar tenderness upon deep palpation. (R. at 302.) Ms. Sykes further noted that Plaintiff was overweight. (R. at 302.) On August 12, 2009, an MRI of Plaintiff's lumbar spine indicated mild spinal canal stenosis with moderate bilateral lateral recess stenosis at L4-L5 secondary to a broad disc protrusion, significant facet overgrowth and grade one spondylolisthesis. (R. at 278-79.)

On October 7, 2009, Ms. Sykes completed a report for the Virginia Department of Social Services. (R. at 197.) Ms. Sykes diagnosed Plaintiff with hyperlipidemia, insomnia, back pain, dermatitis and an anterior subluxation of L4 on L5, without spndylolysis, confirmed by an x-ray from August 18, 2008. (R. at 297.) Ms. Sykes further reported that the MRI of August 12, 2009, confirmed that Plaintiff had mild spinal canal stenosis. (R. at 297.) In her report, Ms. Sykes indicated that Plaintiff would be unable to work or be severely limited in her capacity for self-support for 30 days. (R. at 297.) Moreover, Ms. Sykes indicated that Plaintiff would have a limited capacity for self-support for twelve months. (R. at 297.)   Finally, Ms. Sykes indicated on the report that Plaintiff did not keep a prior appointment with the orthopedic clinic at MCV

due to transportation issues and that Plaintiff had also failed to attend several follow-up
appointments with Ms. Sykes' office. (R. at 297.)

On September 29, 2009, Plaintiff followed-up with Ms. Sykes and again complained of
back pain. (R. at 300.) Ms. Sykes noted an anterior subluxation of Plaintiff's L4-L5, and also
noted that Plaintiff did not follow up with MCV as requested for this subluxation in January
2009. (R. at 300.) Plaintiff also suffered from high cholesterol. (R. at 300.) On December 1,
2009, Ms. Sykes reported that Plaintiff was overweight, had a tobacco habit and had red bumps
on her chest. (R. at 388.)

In an October 2009 report for the Virginia Department of Social Services, Ms. Sykes
diagnosed Plaintiff with dermatitis. (R. at 297.) The record indicates that Plaintiff received
some medication for dermatitis. (R. at 239-96, 299-322, 325-28, 382-407, 408.)

On April 17, 2010, Ann Rawlings, M.D., performed a medical examination of Plaintiff
for the Virginia Department of Rehabilitative Services. (R. at 325-28.) During the examination,
Plaintiff complained of back injury, hypertension, depression, glaucoma, hyperlipidemia,
insomnia, dermatitis and mild spinal stenosis. (R. at 325.) Plaintiff could stand for ten to fifteen
minutes before experiencing numbness in her feet, sit for fifteen to twenty minutes before
experiencing back pain and walk for no more than one to two blocks before experiencing
numbness in her feet. (R. at 326.) Dr. Rawlings further reported that Plaintiff had a slow, but
normal gait, did not use assistive devices for walking, could rise from a chair, could get on an
exam table without difficulty, could toe, heel and tandem walk, could touch her toes without pain
but indicated back pain when straightening up, had a positive straight leg raising test for lower
back pain when lying down but negative when sitting, had 5/5 grip and strength in all muscle
groups, had a normal range of motion with some limitation upon hip flexion and could perform

fine manipulations with her hands. (R. at 327.) Dr. Rawlings also noted that Plaintiff complained of dermatitis, but that the report did not indicate that Plaintiff was suffering from any skin problems. (R. at 325-28.) Dr. Rawlings also indicated that Plaintiff complained of Glaucoma, but Plaintiff denied any loss of peripheral vision. (R. at 326.)

On April 22, 2010, Plaintiff complained to Ms. Sykes of pain in her legs and occasional swelling in her knees. (R. at 387.) Ms. Sykes noted that Plaintiff was referred to an orthopedic appointment at MCV, set for March 14, 2011, for mild spinal stenosis with a moderate bilateral recess at L4-L5, secondary to a broad disc protrusion with significant facet to overgrowth and grade one spondylolisthesis. (R. at 387.) On July 15, 2010, Ms. Sykes reported that Plaintiff had high cholesterol and that lab results were pending. (R. at 386.) During an October 28, 2010, appointment, Plaintiff complained of insomnia, asked for something to help her sleep and further complained of back pain. (R. at 311.) Ms. Sykes noted that Plaintiff's L4 was tender on palpations. (R. at 311.)

On March 14, 2011, Dr. Matthew H. Blake, M.D., completed a VCU Health System report, indicating a negative examination of Plaintiff's bilateral upper extremities and cervical spine. (R. at 376.) Plaintiff had a full range of motion with negative Lhermitte's and negative spurling. (R. at 376.) The report further indicated that Plaintiff achieved a positive straight-leg raising test on both her right and left legs, showed no signs of distress, and was alert and oriented during the appointment. (R. at 377.) Her bone density was normal, and she had no displaced fractures. (R. at 378.) X-rays of Plaintiff's lumbar spine showed facet arthropathy at L4-L5 with grade 1 degenerative spondylolisthesis at L4-L5. (R. at 377-78.)

Plaintiff underwent an L4-L5 epidural steroid root injection on April 14, 2011. (R. at 374, 377-79.) On July 18, 2011, during a follow-up examination, Plaintiff stated that the

epidural injection gave her no relief at all; however, she also indicated that she had not performed any physical therapy. (R. at 372.) Plaintiff also stated that she had been taking anti-inflammatories, but that she did not want to pursue surgical intervention. (R. at 372.) Plaintiff continued to score 5/5 for strength in her bilateral lower extremities and continued to show positive straight-legs on both sides. (R. at 372.)

A report on August 1, 2011, indicated that Plaintiff was overweight, had a tobacco habit, and complained of lower back pain. (R. at 382.) The August 1, 2011, report also indicated that Plaintiff had hyperlipidemia, but noted that there were no labs on her chart. (R. at 382.) While laboratory reports from September 2009 through June 2011 indicated high cholesterol levels, records for subsequent follow-up visits did not indicate whether Plaintiff's hypertension and hyperlipidemia were controlled or uncontrolled. (R. at 382, 386-87, 399-403, 405.) Furthermore, Dr. Rawlings' April, 2010 examination had not indicated that Plaintiff had symptoms of end-organ damage from hypertension. (R. at 326.) Dr. Rawlings had also noted that Plaintiff did not take any medication for hypertension as per her physician's recommendations. (R. at 326.)

On August 2, 2011, Nzinga Teule-Hekima, M.D., completed a report for the Virginia Department of Social Services. (R. at 408.) Dr. Teule-Hekima diagnosed Plaintiff with chronic low back pain with an abnormal MRI and hyperlipidemia. (R. at 408.) Dr. Teule-Hekima opined that Plaintiff would be unable to work or would be severely limited in her capacity for self-support for thirty days and that Plaintiff would have a limited capacity for self-support for twelve months. (R. at 408.)

2.  Plaintiff's Affective Disorder

On April 21, 2010, Randall Colker, Ph.D., performed a psychological examination of Plaintiff. (R. at 329-33.)  Before seeing Dr. Colker, Plaintiff had never seen a psychiatrist or psychological counselor. (R. at 331.)  Although Plaintiff reported having been prescribed Paxil at one time, Plaintiff's physician never refilled the prescription. (R. at 331.)

Plaintiff traveled to the examination by herself on a bus, making two transfers to do so. (R. at 329.)  Plaintiff arrived at the examination clean and neatly dressed, and she appeared pleasant and cooperative during the interview. (R. at 329.)  Dr. Colker noted that Plaintiff's posture and gait were unremarkable and that she made no involuntary movements. (R. at 329.)  Plaintiff's only complaints to Dr. Colker were back problems and depression, both of which, she stated, made her unable to work. (R. at 329.)

Plaintiff stated that her depression started in 1989, following the death of her nine-month-old son. (R. at 330.)  She became more depressed after the death of her twenty-year-old son who was shot and killed in 2003. (R. at 330.)  Following the death of her twenty-year-old son, Plaintiff began to drink heavily and experiment with drugs. (R. at 330.)  Around 2008, Plaintiff began to attend church services and stopped drinking alcohol and using drugs. (R. at 330.)  Plaintiff indicated that her religious beliefs served as an important source of strength for her and that church was the only place that she had contact with other people. (R. at 330-31.)  Plaintiff told Dr. Colker that she had left her past jobs as a cashier, motel worker and housekeeper to care for her mother, who was very demanding of Plaintiff. (R. at 330.)

Plaintiff exhibited good motivation during the session with Dr. Colker and answered his questions appropriately and without difficulty. (R. at 331.)  Plaintiff was well-oriented to time, person and place. (R. at 331.)  She demonstrated good long-term and short-term memory, as

well as the ability to do simple one-step mathematical problems and think fairly on an abstract level. (R. at 331.)

Dr. Colker noted that Plaintiff did appear to be experiencing significant depression and described Plaintiff's energy as poor and motivation as low. (R. at 332.) Also, Plaintiff presented no suicidal tendencies and showed no signs of hallucinations or delusions. (R. at 332.) Plaintiff never had difficulty working with others on the job and appeared to function within the average range of intelligence. (R. at 332.)

Dr. Colker ultimately assigned Plaintiff a global assessment of functioning ("GAF") of 50.[2] (R. at 332.) Dr. Colker opined that Plaintiff had an unlikely ability to function at a significantly higher level than she did at the time. (R. at 333.) Furthermore, Plaintiff could not perform detailed and complex tasks, though she could perform simple and repetitive tasks. (R. at 333.) Plaintiff had difficulty maintaining regular job attendance, was low in perseverance and would need excessive supervision to stay focused on the job. (R. at 333.) While Plaintiff would probably relate minimally with co-workers and the public, she would not likely have any conflict with them. (R. at 333.) Overall, Dr. Colker noted, Plaintiff could not handle the typical stresses of a job. (R. at 333.)

C. Plaintiff's Activities of Daily Living

On November 16, 2009, Plaintiff completed a function report in which she indicated that she lived alone in a room in a boarding house. (R. at 197-204.) She stated that she normally

---

[2]      A GAF of 50 falls at the high end of a range of "serious symptoms," which include "suicidal ideation, severe obsessional rituals, or frequent shoplifting," or "any serious impairment in social, occupational, or school functioning," possibly indicated by a lack of friends or the inability to keep a job. DSM-IV-TR 34 (American Psychiatric Association 2000). Notably, the latest version of the DSM has dropped the use of GAF scores, finding that their use has been criticized due to a "lack of conceptual clarity," and "questionable psychometrics in routine practice." DSM-5 16 (American Psychiatric Association 2013).

spent her days reading, watching TV and using the phone to help to pay her bills. (R. at 197-201.) She left the house twice a week for business and also went to church two times per week. (R. at 200-01.) Plaintiff indicated that she could clean, do the laundry and iron. (R. at 199.) She complained, however, that her back could not take the pressure of house or yard work. (R. at 200.) She made sandwiches when her back was hurting, but otherwise prepared complete meals. (R. at 199.) Plaintiff went shopping for groceries once a month for approximately two hours. (R. at 200.) She maintained the ability to pay her bills, count change, handle a savings account and use a checkbook. (R. at 200.) She could walk for four blocks before needing to stop and rest for ten minutes. (R. at 202.)

Plaintiff indicated that she could no longer stay out late, go to clubs or go to parties because of her conditions. (R. at 202.) She marked that her conditions caused pain when lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and climbing stairs. (R. at 202.) However, Plaintiff's condition did not affect her ability to talk, hear, see, memorize, complete tasks, concentrate, understand, follow instructions, use her hands or get along with others. (R. at 202.) Plaintiff indicated that, on a scale from one to ten, she handled stress at a level of five. (R. at 203.) She could finish what she started and could follow both written and spoken directions, get along with others and handle changes in her routine very well. (R. at 202-03.)

D. Plaintiff's Testimony

Plaintiff testified at a hearing before the ALJ on September 28, 2011. (R. at 34.) Plaintiff stated that at the time she was living in a rooming house with a friend. (R. at 38.) Plaintiff speculated that her back problems were inherited, and she answered that she did not sustain them. (R. at 46.) The only treatment that Plaintiff received for her back pain was an

injection earlier in 2010. (R. at 46-47.)  She was scheduled for two sessions of physical therapy, but she did not attend because of problems getting to Richmond.  (R. at 47.)  While Plaintiff lives in Newport News, she testified that she chose to receive care in Richmond, because she could receive it for free there.  (R. at 37, 41.)

Plaintiff estimated that her pain registered at a seven on a scale of one to ten.  (R. at 47.)  She took over-the-counter medication such as ibuprofen or Aleve to manage this pain, because her doctors would not prescribe her any pain pills.  (R. at 47-48.)  Plaintiff would not undergo surgery, because she was scared.  (R. at 49.)  The over-the-counter medications sometimes helped with her pain, but she experienced the most relief by lying around the house.  (R. at 48.)  Plaintiff spent her days watching television.  (R. at 51.)  Plaintiff noted that the Medical College of Virginia had not placed any restrictions on her activities.  (R. at 56.)

Plaintiff further testified that she had depression, but that she was not currently being treated for it.  (R. at 49.)  Plaintiff did not want to seek treatment at the Community Service Board, because she had gone before and they never recommended that she see a psychiatrist.  (R. at 49.)  Plaintiff stated that she had been experiencing depression since 2003, that she had not received any treatment for it since that time and that she had worked during that period.  (R. at 50-51.)  She also testified that she had a drinking problem in 2003 when her depression began, but that she did not currently have a problem with alcohol.  (R. at 59.)

E.  Non-Treating State Agency Physician's Opinion

On May 5, 2010, Jannifer Hill-Keyes, Ph.D. completed a Psychiatric Review Technique of Plaintiff.  (R. at 334-45.)  Dr. Hill-Keyes assessed that from October 29, 2008, to May 5, 2010, Plaintiff's affective disorder was not severe.  (R. at 334.)  Specifically, she noted that an affective disorder was present, but that it did "not precisely satisfy the diagnostic criteria." (R. at

10

337.) Dr. Hill-Keyes opined that Plaintiff had a mild functional limitation in her activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace and suffered no repeated episodes of decompensation of extended duration. (R. at 342.)

On May 11, 2010, Plaintiff underwent a physical residual functional capacity ("RFC") assessment by Dr. Karen Sarpolis, M.D., a state agency physician. (R. at 348-54.) Dr. Sarpolis opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (R. at 349.) Plaintiff could sit, stand and/or walk for about six hours during an eight-hour workday. (R. at 349.) Plaintiff was unlimited in her ability to push and/or pull. (R. at 439.) Dr. Sarpolis further noted that Plaintiff was occasionally limited in her postural movements, but had no manipulative, visual, communicative or environmental limitations. (R. at 351-52.) While Plaintiff complained of high blood pressure and hyperlipidemia, Dr. Sarpolis noted that Plaintiff did not have end organ damage resulting from those conditions. (R. at 354.)

## II. PROCEDURAL HISTORY

On October 26, 2009, Plaintiff filed an application for SSI due to disability from disorders of the back, affective disorder, glaucoma, hyperlipidemia, hypertension, dermatitis and obesity. (R. at 94, 142.) The alleged onset date of Plaintiff's disability was initially August 9, 2003; however, it was later amended to April 21, 2010. (R. at 16, 36, 39, 139-40, 142.) Plaintiff's claim was denied initially on May 12, 2010, and again on reconsideration on October 5, 2010. (R. at 93, 103.) Plaintiff filed a written request for hearing on November 24, 2010, and appeared before an ALJ on September 28, 2011, represented by counsel. (R. at 16, 108, 128.) On October 11, 2011, the ALJ denied Plaintiff SSI benefits. (R. at 16-27.) On December 20, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

### III.  QUESTION PRESENTED

1. Did the ALJ err in assigning Plaintiff's treating physicians' opinions less than controlling weight?

2. Was the ALJ's assessment of Plaintiff's credibility supported by substantial evidence in the record and determined by the application of the correct legal standard?

### IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted).  If the ALJ's determination is not supported by substantial

evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

---

[3]     SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[4] based on an assessment of the claimant's RFC and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.

1989). Only when the hypothetical posed represents all of the claimant's substantiated

impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the

claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly

entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A.     The ALJ's Decision

Plaintiff, represented by counsel, appeared for a hearing before an ALJ on September 28,

2011. (R. at 16, 108, 128.) On October 11, 2011, the ALJ rendered his decision in a written

opinion and determined that, based on the application for SSI filed on October 26, 2009, Plaintiff

was not disabled under the Act. (R. at 27.)

The ALJ followed the five-step sequential evaluation process as established by the Social

Security Act in analyzing whether Plaintiff was disabled. (R. at 16-17); *see also* 20 C.F.R.

§ 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in SGA since the alleged

onset date. (R. at 18.) At step two, the ALJ determined that Plaintiff suffered severe

impairments in the form of disorders of the back and affective disorder. (R. at 18-19.) Based on

the overall record, the ALJ also determined that Plaintiff's glaucoma, hyperlipidemia, dermatitis

and obesity were not severe. (R. at 19.) At step three, the ALJ determined that Plaintiff did not

have an impairment or combination of impairments that met or equaled the severity of one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-21.) *See* 20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526, 404.920(d), 416.925, 416.926.

At step four, the ALJ determined that Plaintiff had the RFC to perform less than the full

range of light work as defined in 20 C.F.R. § 416.967(b). (R. at 21.) Plaintiff had to avoid

overhead work activity, but could lift, carry, push and pull up to ten pounds occasionally. (R. at 21.) Plaintiff could stand and/or walk for four hours and sit for six hours within an eight-hour workday with a sit/stand option, and she could walk for one to two blocks at a time before sitting. (R. at 21.) She could also occasionally stoop, bend or crouch, but she had to avoid crawling, kneeling and climbing ladders, ropes and scaffolds. (R. at 21-22.) Furthermore, the ALJ determined that Plaintiff was limited to simple, routine and low-stress tasks that required limited contact with co-workers and the public. (R. at 22.)

In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence. (R. at 22-25.) The ALJ followed a two-step analysis of whether the medically determinable physical or mental impairments could reasonably be expected to produce Plaintiff's pain and symptoms, and if so, the extent to which the symptoms limited Plaintiff's functioning. (R. at 22.) The ALJ concluded that, based on the evidence, Plaintiff's impairment could reasonably be expected to cause the alleged symptoms, but he found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms lacked full credibility. (R. at 22.) Finally, at step five of the analysis, the ALJ concluded that, based on Plaintiff's age, education, work experience and RFC, a significant number of jobs existed in the national economy that Plaintiff could perform. (R. at 25.)

Plaintiff seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 14.) Specifically, Plaintiff challenges the weight assigned to Plaintiff's treating sources' opinions and the ALJ's assessment of Plaintiff's credibility. (Pl.'s Mem. at 6, 11.) Defendant asserts that substantial evidence supports the ALJ's decision. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 12) at 13, 18.)

B.    The ALJ did not err in applying the Treating Physician Rule.

Plaintiff challenges the ALJ's decisions to afford little weight to the opinions of Ms. Sykes, Dr. Teule-Hekima and Dr. Colker, arguing that "the ALJ erred in rejecting" these opinions. (Pl.'s Mem. at 6.) Defendant responds that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 13-17.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. *See* 20 C.F.R. § 416.912(f).  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  *See* 20 C.F.R. § 416.927(c)(2).  If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, the opinions of both treating physicians and "other medical sources," such as treating nurse practitioners, must be weighed using the factors in 20 C.F.R. § 404.1527.  *See* SSR 06-3p.  Moreover, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  However, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when

the individual opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the source's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating source's opinions: (1) the length of the treating source's relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6); SSR 06-3p. However, those same regulations specifically vest the ALJ — not the treating sources — with authority to determine whether a claimant is disabled as that term is defined by statute. 20 C.F.R. § 404.1527(e)(1).

Here, because the opinions of the Plaintiff's treating sources were either inconsistent with other evidence or lacking in support, the ALJ was forced to reconcile divergent opinions offered by treating sources and those offered by state agency physicians. Ultimately, the ALJ gave little weight to all three treating sources' opinions and controlling weight to none. (R. at 23.)

### 1. Dr. Teule-Hekima's Opinion

Plaintiff argues that the ALJ erred in rejecting Dr. Teule-Hekima's opinion. (Pl.'s Mem. at 9.) Plaintiff essentially argues that his opinion should have been given greater weight by the ALJ, because he is one of only three individuals to treat Plaintiff. (Pl.'s Mem. at 7-9.) Defendant argues that substantial evidence supports the ALJ's determination of the weight assigned to Dr. Teule-Hekima's opinion. (Def.'s Mem. at 13.) Defendant further argues that Dr.

Teule-Hekima's opinion was conclusory, unsupported by documentation and generally inconsistent with the record as a whole. (Def.'s Mem. at 14-16.)

First, the ALJ did not reject Dr. Teule-Hekima's opinion; rather, he assigned it little weight, because it was inconsistent with substantial evidence in the record. (R. at 23.) Specifically, the ALJ emphasized that "[i]n August 2011, just before Dr. Teule-Hekima reported that the claimant would be unable to work, her physical examination showed obesity but normal heart and lung findings, full range of motion, and equal strength in all of her muscle groups with no indication of weakness." (R. at 25.)

Moreover, the record contains only a single page report from Dr. Teule-Hekima. (R. at 408.) As Defendant correctly notes, "Dr. Teule-Hekima provided no supporting documentation whatsoever for his opinion." (Def.'s Mem. at 14.)   In this opinion, Dr. Teule-Hekima notes that Plaintiff would be unable to work or support herself for thirty days and would have a limited capacity for self-support for twelve months. (R. at 408.) Nothing within this one page report, however, indicates why Plaintiff's alleged chronic low back pain or hyperlipidemia would render Plaintiff unable to work or limit her capacity for self-support. (R. at 408.)

Contrary to Dr. Teule-Hekima's unsupported opinion, Plaintiff's MRI simply indicated mild to moderate spinal stenosis. (R. at 278-79.) An April 28, 2010, report for the Virginia Department of Rehabilitative Services made by Dr. Rawlings indicated that Plaintiff's gait was slow but normal, that Plaintiff used no assistive devices for walking, that she had no difficulty rising from a chair and getting onto an examination table, that she could toe, heel and tandem walk, that she could touch her toes without pain but complained of back pain when straightening up, that her straight-leg raising test was positive for lower back pain when lying down but negative when sitting, that she had maximum grip and strength in all of her muscle groups, that,

19

besides some reduced range upon hip flexion, she had a normal range of motion, that she could do fine manipulations with her hands, that she had bilaterally equal deep tendon reflexes and that her Romberg test was negative. (R. at 327.) Moreover, an April 18, 2011, report from the VCU Health System indicated that while Plaintiff experienced back pain during her straight-leg tests, she continued to show maximum strength in her bilateral lower extremities. (R. at 372.)

Plaintiff's own statements provide substantial evidence to support the ALJ's determination to afford Dr. Teule-Hekima's opinion less than controlling weight. Despite complaining of intense pain, Plaintiff testified that she only took over-the-counter medication for pain, because her doctors would not prescribe her any prescription pain medication. (R. at 47.) Plaintiff also stated that lying around the house helped with her pain more than the non-prescription medication. (R. at 48.) Furthermore, Plaintiff reported that she fed herself, cleaned the house, did laundry, ironed, watched television, read, went shopping once a month and went to church twice a week. (R. at 197-201.) Because Dr. Teule-Hekima's opinion contained no supporting documentation and was inconsistent with other substantial evidence in the record, the ALJ did not err in assigning it little weight.

Finally, the regulations do not require the ALJ to give significant weight to Dr. Teule-Hekima's conclusory opinion that Plaintiff is unable to work. Rather, the regulations clearly state that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 416.927(d)(1). Medical professionals are qualified to make medical diagnoses and opine on functional limitations; however, they are not competent to issue dispositive opinions on Plaintiff's disability, such opinions are reserved to the Commissioner. 20 C.F.R. § 416.927(d).

2.  Ms. Sykes' Opinion

Plaintiff also argues that the ALJ erred in rejecting Ms. Sykes' opinion. (Pl.'s Mem. at 9.)  Plaintiff essentially argues that her opinion should have been given greater weight by the ALJ, because Ms. Sykes is one of the three individuals who treated Plaintiff and because Ms. Sykes found that Plaintiff's severe medical impairments rendered her unable to work. (Pl.'s Mem. at 7-9.)  Defendant argues that substantial evidence supports the ALJ's determination of the weight assigned to Ms. Sykes' opinion. (Def.'s Mem. at 13.)  Defendant further argues that Ms. Sykes' opinion was conclusory, unsupported by documentation and generally inconsistent with the record as a whole. (Def.'s Mem. at 14-16.)

Contrary to Plaintiff's assertion, the ALJ did not reject Ms. Sykes' opinion; he merely assigned it little weight, because her assessments were "inconsistent with other substantial evidence of record, including the claimant's course of treatment and treatment history, the medical signs and findings, and the claimant's activities of daily living." (R. at 23.)

Plaintiff's argument further suggests that the ALJ did not afford proper consideration to Ms. Sykes' opinion, because she is not a doctor, but an FNP. (*See* Pl.'s Mem. at 8.)  Rather, the ALJ properly considered Ms. Sykes' opinion in accordance with SSR 06-3p.  SSR 06-3p clarifies that opinions from "medical sources, who are not technically deemed 'acceptable medical sources' . . . should be evaluated on key issues . . . along with other relevant evidence in the file." SSR-06-3p.  Under the regulations, an FNP is considered a medical source that is not an "acceptable medical source." *See* 20 C.F.R. 404.1513(d)(1); SSR 06-3p.  The opinions of such sources must be considered when evaluating a claim.  The ALJ "generally should explain the weight given to opinions from these 'other sources.'" SSR 06-3p.

21

Plaintiff correctly notes that under SSR 06-3p the ALJ must consider and weigh the opinion of Ms. Sykes. However, the ALJ's decision indicated that he did indeed consider and weigh Ms. Sykes opinion, rather than simply dismissing it. The fact that the ALJ did not give great weight to Ms. Sykes' opinion does not demonstrate that he completely rejected it. After discussing Ms. Sykes' opinion, the ALJ merely determined that her opinion was not supported by evidence in the record. (R. at 22-24.) Specifically, the ALJ noted that "the record overall does not persuasively support . . . Ms. Sykes' statements that the claimant's physical impairments preclude all work." (R. at 24.) Moreover, by discussing his comparisons between Ms. Syke's unsupported opinion and other substantial evidence in the record, the ALJ satisfied SSR 06-3p's requirement that an ALJ explain the weight that he gives to opinions from other medical sources.

Ms. Sykes ultimately reached the same conclusion as Dr. Teule-Hekima, opining that Plaintiff would be unable to work or support herself for thirty days and would have a limited capacity for self-support for twelve months. (R. at 297.) As discussed above, however, this opinion was inconsistent with other substantial evidence of record, including other objective medical evidence and Plaintiff's own statements regarding her activities of daily living. As Ms. Sykes' opinion was inconsistent with this substantial evidence, the ALJ did not err in assigning it little weight.

### 3.  Dr. Colker's Opinion

Plaintiff argues that the ALJ erred in rejecting the opinion of the examining psychologist, Dr. Colker. (Pl.'s Mem. at 9-10.) Plaintiff contends that Dr. Colker's opinion should have been given greater weight by the ALJ, because his consultative examination revealed major depressive

disorder and a GAF of 50.[5] (Pl.'s Mem. at 7-9.) Defendant argues that substantial evidence

supported the ALJ's determination of weight assigned to Dr. Colker's opinion. (Def.'s Mem. at

13, 16-17.) Specifically, Defendant argues that Dr Colker's opinion was conclusory,

unsupported and "inconsistent with the record as a whole." (Def.'s Mem. at 16.)

Dr. Colker opined that Plaintiff was not capable of most detailed and complex tasks,

appeared to have difficulty maintaining regular job attendance, was low in perseverance, would

need excessive supervision to stay focused on the job and would probably relate minimally with

co-workers and the public, though she would not likely have any conflict with them. (R. at 333.)

Overall, Dr. Colker opined that Plaintiff would probably deal inadequately with the typical

stresses of a job. (R. at 333.)

The ALJ assigned Dr. Colker's opinion little weight, because his assessment was

"inconsistent with other substantial evidence of record." (R. at 23.) Specifically, the ALJ

emphasized that "Dr. Colker's GAF score assessment appears to be based primarily on the

claimant's subjective complaints and does not reflect her highest level of functioning over the

past 12 months, which is probably higher based on other evidence." (R. at 23.) Substantial

evidence supports the ALJ's determination to assign little weight to Dr. Colker's opinion.

Although Plaintiff only alleges disability from April 21, 2010, (R. at 16), she reported to

Dr. Colker that her depression began in 1989 with the death of one of her sons and worsened in

2003 when another son was killed. (R. at 330.) It was at that time that she began to experiment

with drugs and alcohol. (R. at 330.) Sometime in 2008, Plaintiff began to attend church

services, an important source of strength for her, and she stopped abusing alcohol and drugs. (R.

at 330.) However, during that time, Plaintiff had engaged in full-time/SGA-level work as a

---

[5]      *See supra* note 3.

23

housekeeper. (R. at 170.) Given that Plaintiff's depression occurred upon the deaths of her sons, that Plaintiff has since given up alcohol and drugs, that Plaintiff is drawing strength from attending church and that Plaintiff has worked since her first reports of depression, substantial evidence supports the ALJ's determination that Plaintiff's depression was situational and that Dr. Colker's score assessment did "not reflect her highest level of functioning over the past 12 months . . . ." (R. at 23.)

Moreover, substantial evidence supports the ALJ's determination that Dr. Colker's own objective findings were inconsistent with his opinion. (R. at 24, 329-32.) Dr. Colker noted that Plaintiff was able to reach the examination alone by a bus route that required two transfers. (R. at 329.) Plaintiff arrived at the examination neatly dressed and presented a pleasant and cooperative demeanor during the examination. (R. at 329.) Furthermore, Dr. Colker noted that Plaintiff understood his questions, answered them appropriately and was generally alert and oriented. (R. at 331.) She demonstrated good long-term and short-term memory, as well as good motivation. (R. at 331.) Dr. Colker also noted that Plaintiff showed no indications of hallucinations or delusions. (R. at 332.) Moreover, Plaintiff reported neither current suicidal ideation nor difficulty with getting along with others on the job. (R. at 332.)

Plaintiff's own activities of daily living support the ALJ's determination. Plaintiff indicated that she could feed herself, clean the house, do laundry, iron, watch television, read, go shopping once a month, and go to church twice a week. (R. at 197-201.) Plaintiff also indicated that she had no problems with concentration, understanding, memory, completing tasks, following instructions or getting along with others. (R. at 202-03.) Importantly, Plaintiff reported that she follows both written and spoken instructions very well, that she got along well

24

with authority figures, that she handled changes in routine well and that she had never lost a job due to problems getting along with other people. (R. at 202-03.)

Finally, Plaintiff's course of treatment for psychiatric problems further undermined Dr. Colker's ultimate conclusions. (R. at 24.) The record does not indicate that Plaintiff has ever had any significant treatment for mental health issues. Plaintiff has never been hospitalized for psychiatric reasons, nor had she ever seen a psychiatrist or psychological counselor before visiting with Dr. Colker in April of 2010. (R. at 331.) Moreover, the Community Service Board apparently refused to refer her to a psychiatrist. (R. at 49.) Therefore, substantial evidence in the record provides support for the ALJ's decision to give little weight to Dr. Colker's opinion. (R. at 23.)

C.  The ALJ did not err when he assessed Plaintiff's credibility.

Plaintiff argues that the ALJ incorrectly rejected Plaintiff's "credibility on the basis of her activities of daily living." (Pl.'s Mem. at 11.) Defendant maintains that substantial evidence supports the ALJ's assessment of Plaintiff's credibility. (Def.'s Mem. at 18.)

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13.

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements

about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

The ALJ considered all of the evidence regarding Plaintiff's symptoms in compliance with 20 C.F.R. § 416.929, SSR 96-4p and SSR 96-7p, including objective medical evidence, other evidence and opinion evidence. (R. at 22.) The ALJ determined that Plaintiff's underlying medical impairments could reasonably be expected to produce her alleged symptoms. (R. at 22.) However, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her condition were not fully credible, to the extent that they were inconsistent with other evidence in the record. (R. at 22-24.) Plaintiff argues that the ALJ improperly rejected her credibility based largely on her daily activities and erred by failing to consider the objective medical evidence. (Pl.'s Mem. at 11.) However, as long as substantial evidence in the record supported the conclusion, this Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997).

First, the ALJ did in fact consider objective medical evidence, and that evidence supports the ALJ's finding. The ALJ noted that Plaintiff "has full range of motion and was in no acute distress." (R. at 25.) Moreover, the ALJ considered that Plaintiff could ambulate effectively and had normal strength, despite positive bilateral straight leg raise tests in March and July 2011. (R. at 25.) The ALJ found that Plaintiff's "examinations have shown few physical abnormalities as well as findings/observations that are inconsistent with the claimant's reports of pain." (R. at 24.) The ALJ also considered an August, 2011 physical examination that indicated that Plaintiff

26

had normal heart and lung functions, a full range of motion and "equal strength in all of her muscle groups with no indication of weakness." (R. at 25.) The ALJ properly considered this objective medical evidence in conjunction with Plaintiff's own statements regarding her daily activities. (R. at 22-25.)

Plaintiff reported that her daily activities included feeding herself, cleaning the house, doing laundry, ironing, watching television and reading. (R. at 197-201.) Furthermore, Plaintiff stated that she went shopping once a month and attended church twice a week. (R. at 197-201.) Dr. Sarpolis opined that, despite her complaints of extreme pain, Plaintiff had an unlimited ability to push or pull, could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, and could stand, walk or sit for about six hours in an eight-hour workday. (R. at 349.) Additionally, Plaintiff only had occasional postural limitations. (R. at 351.) Plaintiff had a slow but normal gait, could walk without an assistive device, was able to touch her toes, had full grip capabilities, had full strength capabilities in all muscle groups and had a negative Romberg sign. (R. at 327.) Ultimately relying on Dr. Sarpolis' report, emergency department records, treatment notes and the consultative examination report in addition to Plaintiff's reported daily activities, the ALJ reasonably determined that Plaintiff's complaints of near constant extreme pain were only partially credibly. (R. at 22-25.)

Moreover, evidence of Plaintiff's medications and course of treatment support the ALJ's determination. 20 C.F.R. § 416.929(c)(3)(iv)-(v). Plaintiff complained that, on a scale of zero to ten, her pain was usually a seven. (R. at 48.) Despite this allegedly large degree of pain, Plaintiff received only a single epidural injection and only took over-the-counter medication for her pain. (R. at 46-47.) Indeed, Plaintiff testified that her attending physicians would not prescribe her pain medication. (R. at 47.) Moreover, Plaintiff did not complete her post-

injection, home physical-therapy program that was assigned her due to the difficulties that she had in traveling to Richmond.  (R. at 47, 372.)  Furthermore, as to Plaintiff's alleged depression, Plaintiff had not been hospitalized for psychiatric reasons, and the Community Service Board would not refer her to a psychiatrist.  (R. at 331, 49.)  Therefore, because substantial evidence supported the ALJ's credibility assessment, the ALJ did not err.

## VI.  CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: October 15, 2013

28